UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SYLVESTER STROMAN,

                              Petitioner,

        vs.

                                                              9:05-CV-624
JOSEPH F. DAVID,                                              (GTS/GJD)
Superintendent of Greene Correctional Facility
                              Respondent.
_____

SYLVESTER STROMAN, Petitioner *Pro Se*
MICHAEL G. McMARTIN, Assistant Attorney General for Respondent

GUSTAVE J. DI BIANCO, Magistrate Judge

# REPORT-RECOMMENDATION

        This matter has been referred to me for Report and Recommendation by the

Honorable Glenn T. Suddaby, United States District Judge, pursuant to 28 U.S.C.

§ 636(b) and Local Rules N.D.N.Y. 72.3(c).

        Petitioner brings this action for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254, challenging a judgment of conviction from the Schenectady County Court.

On September 14, 2001, petitioner was convicted *in absentia* after a jury trial of

Reckless Endangerment, Second Degree, Criminal Possession of a Weapon, Second

Degree, and Criminal Possession of a Weapon, Third Degree.  On October 10, 2001,

petitioner was sentenced *in absentia* to a determinate term of incarceration for fifteen

years on the second degree weapons possession charge, a concurrent, determinate

term of seven years on the third degree weapons possession charge, and a concurrent

term of one year on the reckless endangerment charge.  On August 7, 2002,

petitioner appeared in court and was re-sentenced to an indeterminate term of

incarceration of seven and one half to fifteen years on the second degree weapons

possession charge, a concurrent indeterminate term of three and one half to seven

years on the third degree weapons possession charge, and a concurrent term of one

year on the reckless endangerment charge.

The Appellate Division affirmed petitioner's convictions.  *People v. Stroman*,

6 A.D.3d 818, 775 N.Y.S.2d 117 (3ʳᵈ Dep't. 2004).  The New York Court of Appeals

denied leave to appeal on June 10, 2004.  *People v. Stroman*, 3 N.Y.3d 648, 816

N.E.2d 209 (2004).   Petitioner raises two grounds in support of his petition:

1.  The trial court erred when it denied two of petitioner's challenges to
potential jurors for cause, requiring petitioner to use his peremptory challenges.
(Petition, ¶ 12 (A)).

2.  The trial court erred when it conducted the trial in petitioner's absence.
(Petition, ¶ 12 (B)).

Respondent has filed an answer with a memorandum of law (Dkt. No. 8), and

the pertinent state court records.  For the following reasons, this court will

recommend that the petition be denied and dismissed.

## DISCUSSION

## 1.   <u>Facts</u>

On June 27, 1998, Kenneth Robinson was shot in the ankle while he was in his

car at a Sonoco gas station in Schenectady, New York. Record on Appeal Vol. II[1] (RA2) at 558, 572, 581).  On June 29, the prosecution filed a felony complaint, charging petitioner with Attempted Murder, Second Degree. (RA1 at 5, 32). Petitioner was not taken into custody, however, until August 5, 2000, after he waived extradition from North Carolina. (RA1 at 32).  On August 10, 2000, petitioner was arraigned by a Schenectady City Court Judge and was released on his own recognizance on October 12, 2000. (RA1 at 33).

The Schenectady County grand jury indicted petitioner on January 8, 2001 for two courts of Assault, First Degree, one count of Assault, Second Degree, and one count each of Criminal Use of a Firearm, First Degree and Criminal Possession of a Weapon, Second and Third Degrees. (RA1 at 8-10).  Petitioner was arraigned on the indictment on January 22, 2001. (RA1 at 15-23).  Petitioner pled not guilty to all charges. (RA1 at 19).  Petitioner's counsel requested that petitioner be again released on his own recognizance, or alternatively, that he be released under "probation supervision." (RA1 at 21).

Before the judge set bail, he warned the petitioner about the consequences of failing to appear. (RA1 at 21-22).  The judge specifically requested that petitioner's

---

[1] The record on appeal is divided into three volumes, thus, the court will refer to RA1-RA3.

counsel review a "*Parker*[2] admonishment" with petitioner.  The second and third

paragraphs of the *Parker* admonishment state

> If you fail to appear, without a valid excuse communicated to the District Attorney and the Court, the proceedings may go on without you, <u>even including a trial</u>.  Furthermore, if you are convicted, being either present or absent, and you fail to appear for sentencing, without a valid excuse, you will be sentenced even though you are absent.
> As a further consequence of your failure to appear, your bail premium and/or collateral may be forfeited.

(RA3 at 971a)(emphasis in original).  The final paragraph states "I have read and

understand the above and agree to be bound by it as a condition of my being released

on bail, or on my own recognizance, and have consulted with my attorney prior to

signing this document."  (RA3 at 971a).

The court then asked petitioner to state on the record whether he had reviewed

the *Parker* warning with his attorney and specifically asked petitioner whether he

understood the document and ***agreed to be bound by it.*** (RA1 at 21-22).  Petitioner

signed the document in court, and the judge stated that he would file the document

with the Clerk. *Id.*  The court then set $ 25,000.00 bail. (RA1 at 22).  It does not

appear that petitioner was able to immediately post bail, because the record states

that he was "remanded". (RA1 at 23).

Several pre-trial motions were made in the months between January and

---

[2] *People v. Parker*, 57 N.Y.2d 136, 142, 454 N.Y.S.2d 967, 440 N.E.2d 1313 (1982). *Parker* describes the facts the trial court must consider before deeming a defendant to have knowingly and voluntarily waived his right to be present at his criminal trial.

September 2001, and the trial court conducted several hearings concerning the status of the pending criminal charges.  On April 5, 2001, the court conducted a very brief hearing to advise the parties that the court had reached a decision on one of the pre-trial motions. (RA1 at 103).  Petitioner was present in court for the hearing.[3]  *Id*.

On June 8, 2001, however, petitioner failed to appear in court for a scheduled hearing.  The court set another hearing for July 6, 2001 to discuss the petitioner's whereabouts and to set a trial date.  (RA1 at 106).  The judge discussed the *Parker* admonishment that petitioner had signed and asked the prosecutor to make an effort to locate the petitioner prior to the July 6, 2001 hearing.  The judge then issued a bench warrant for petitioner. *Id*.

Petitioner failed to appear for the proceeding on July 6, 2001.  (RA1 at 109).  At the hearing, the court stated that the proceeding had been scheduled to determine whether petitioner could be located, and if not, to determine whether the trial should proceed in his absence. (RA1 at 109).  Petitioner's counsel stated that he "had no contact with [petitioner] since the last court date." *Id*.  The prosecutor stated that his office had advised both the State Police Violent Felony Warrants Squad and the Schenectady Police Department of the bench warrant. *Id*.  The prosecutor also stated that he was "confident" that the bench warrant had been entered into both the state

---

[3] Petitioner appears to have been "present" at this hearing because he was still in custody. Petitioner must have been released some time after the April 5, 2001 hearing because at the end of that hearing, the court stated that petitioner was "remanded." (RA1 at 103).  This language implies that petitioner was still incarcerated at that time.

and national warrant databases.  (RA1 at 109-10).

Petitioner's counsel then objected "to [petitioner] being tried in absentia," and argued that the prosecution needed to show more than their referral of the matter to "police agencies." (RA1 at 110-11).  Petitioner's counsel argued that, according to *Parker*, the prosecutor needed to show what those "police agencies" had done to locate the petitioner before the court could determine that petitioner had waived his right to be present. (RA1 at 110).  The prosecutor stated that he did not know exactly what each agency had done, except to state that it was "their job to look for this defendant." (RA1 at 111).  The prosecutor then stated that petitioner was originally from North Carolina, and "they suspect that he may well have gone down there," but conceded that he did not specifically know what efforts had been made to locate petitioner." (RA1 at 111).

The court stated that "as a general matter," if petitioner signs a *Parker* admonishment, but he absconds prior to trial, and the prosecution makes a good faith effort to locate the defendant, then trial should proceed. (RA1 at 112).  The court discussed the reasons for proceeding to trial in a timely manner, and stated that as long as the prosecution made a reasonable effort to locate petitioner by contacting hospitals and local jails to see if he was somehow prevented from appearing, then trial should proceed. *Id.*  The court stated that years could go by before the petitioner would "either be picked up or decides to answer these charges and come to court."

*Id.*

The court decided to tentatively set a date for petitioner's trial to commence in August. (RA1 at 113).  The judge stated that he was setting the August date so that the parties would have additional time within which to locate the petitioner. (RA1 at 113).  The judge then encouraged the prosecutor to monitor hospitals, the local jails, and make some reasonable inquiry to see if petitioner could be located. (RA1 at 114). The judge stated that he would issue a firm trial date at the August appearance. *Id.*

On August 31, 2001, the court conducted the final pre-trial hearing. (RA1 at 117-20).  Petitioner's counsel stated that he had not seen petitioner. (RA1 at 117). The prosecutor also stated that he had no knowledge of petitioner's whereabouts. *Id*. The court did not set a specific date for petitioner's trial, but told the parties to be available in September.  (RA1 at 119-20).

On September 10, 2001, prior to jury selection and outside the presence of the prospective jurors, the court conducted a hearing regarding petitioner's absence. (RA2 at 384-95).  The court asked the prosecutor and defense counsel about what efforts had been made to locate petitioner. (RA2 at 384).  The prosecutor stated that his office had contacted various law enforcement agencies, including the Schenectady Police Department, the State Police Violent Felony Warrants Squad, and the United States Marshals Service. *Id.*  The prosecutor stated that he put the June 2001 bench warrant into the computerized criminal history system, and had

contacted local hospitals and jails to try to locate petitioner. *Id*.

The prosecutor also stated that he spoke with the mother of petitioner's girlfriend. (RA2 at 384). This woman told the prosecutor that, although she did not know where petitioner was, he had indicated to her that he intended to leave the area. (RA2 at 384-85). Defense counsel argued that he did not believe that there was a sufficient basis to proceed in petitioner's absence, based on the single *Parker* warning at his arraignment. (RA2 at 385). Defense counsel also stated that his client had ties "to either North Carolina or South Carolina," and argued that under *Parker*, the prosecutor had not made sufficient efforts to find petitioner. (RA2 at 385-86). Counsel argued that if the trial proceeded, petitioner's confrontation rights would be violated. (RA2 at 386).

The court ruled that the trial should proceed. (RA at 386-87). The court found that the *Parker* admonishment was ***clear***, and although petitioner had a right to be present at all material stages of the trial, he could waive that right and had done so by his conduct. (RA2 at 386). There was some discussion about when to advise the jury they could not draw any adverse inferences if petitioner failed to testify or offer evidence, but defense counsel was not sure when he wanted to the jury to receive that instruction. (RA2 at 388-89).

The trial proceeded, and jury selection was completed on September 10, 2001. Testimony began on September 12, 2001. During the court's initial instructions to

8

the jury on September 12, 2001, the court stated that after the prosecution rested its case,

> the case lies with the defense as to whether or not the defense intends to
> and does introduce proof or evidence.  That's their choice.  If the
> defense chooses not to introduce any evidence or testimony, you can't
> draw any inference against the defendant because of that.  The reason is
> the only burden here is the one the People have, which is to prove guilt
> of each element of each of these crimes beyond a reasonable doubt.

(RA2 at 415).  No direct mention of petitioner's absence was made in the initial instructions to the jury.

On September 12, 2001, during a break in the testimony, the judge stated that he wanted to put some statements on the record regarding the efforts to find petitioner. (RA2 at 504-505).  The prosecutor stated that although he did not know the exact dates, investigators from his office put the June 2001 bench warrant "in the state system and in the nationwide system." (RA2 at 505).  The prosecutor stated that his office contacted the New York State Police Violent Warrant Squad and an Assistant United States Marshal. (RA2 at 505-506).

This time, however, the prosecutor also stated that an investigator from his office had also contacted  Captain Pendergrast from the Henderson Police Department in North Carolina because that was where petitioner was found when he was initially arrested on the charges in 2000. (RA2 at 506).  The prosecutor did not know when that contact occurred because his investigator did not write down the date.  *Id.*  The North Carolina police had not located petitioner. *Id.*

9

The judge then asked the prosecutor what actions the North Carolina authorities took in their efforts to find petitioner. *Id.*  The prosecutor stated that he was not familiar with the "process" taken after the agency is informed that someone is "wanted." (RA2 at 507).  The prosecutor assumed that these agencies made "normal inquiries in their normal business, however they go about trying to locate people. . ." *Id.*

The prosecutor stated he  requested that his investigators contact the New York State and North Carolina prison systems, but could only confirm that the New York State prison system had actually been contacted. (RA2 at 507).  The court told the prosecutor that he should check with his investigator to find out what further efforts were made, and the judge emphasized that there should be "somebody in North Carolina" who could find out whether petitioner was in a state or local facility in North Carolina. (RA2 at 508-509).  The court also emphasized that the prosecutor should follow up on what the police agencies were actually doing about the request. (RA2 at 509).  The prosecutor stated that he would "make further effort to get more detailed information" from the investigators in his office about who they had contacted, and what actions the police agencies took to locate petitioner. (RA2 at 510).

The court also asked petitioner's counsel about his efforts to locate his client. Petitioner's counsel stated, "I don't think it's my burden to locate him." *Id*.  When

the judge pressed counsel for an answer, counsel stated that he spoke with his client's "on-again, off-again girlfriend," Dana Wolford, who said that she had not heard from him. *Id.*  Petitioner's counsel stated that was the extent of his effort to locate the petitioner.  Petitioner's girlfriend was the only person in Schenectady that counsel knew who had some ties to petitioner. *Id.*

Petitioner's counsel renewed his objection to the trial proceeding in petitioner's absence, and made a motion for a mistrial. (RA2 at 511-12).  Petitioner's counsel argued that an insufficient showing had been made to justify proceeding in petitioner's absence, and that the time to make that showing was before the trial. (RA2 at 511-13).  The prosecutor then listed the local jails and hospitals that had been contacted on Monday, September 10, 2001.  (RA2 at 513).  Petitioner's counsel continued to argue that

> when they found this guy before they found him in Henderson, North Carolina.  So, he gets released from the Schenectady County Jail and he disappears.  Now, sure you want to search Schenectady and the Capital District, but you also want to search North Carolina, and you haven't heard any detail as to what's been done in that regard. . . And I also think if they're waiting until the day of trial to do the local search that [the prosecutor] just detailed, I think that's problematic as well.

(RA2 at 514).  The court reserved on the issue.  (RA2 at 515, 512).

Prior to the testimony resuming on September 13, 2001, the court conducted another hearing regarding petitioner's absence.  The prosecutor stated that the bench warrant was entered into the state system on June 11, 2001, but admitted that due to

11

an oversight, the bench warrant had not been entered into the national system until Monday, September 10, 2001, the day of jury selection.  (RA3 at 631).  The prosecutor stated that there was "no hit" in the national system, and that petitioner had not been in any state or federal facility recently. (RA3 at 637).  The prosecutor stated that Neil Sullivan from the United States Marshals Service told him that the U.S. Marshals spoke with Dana Wolford, her mother, father, and stepmother, as well as petitioner's grandmother.  (RA3 at 631-32, 633).  Dana Wolford stated that she had a telephone conversation with petitioner "from some long distance phone number," but that she did not know from where petitioner was calling. (RA at 632).  None of the individuals contacted by the U.S. Marshal knew where petitioner's location.  *Id*.  The Marshals also checked three addresses in Schenectady, with no success. (RA3 at 632).

Later, the prosecutor told the judge that when the prosecutor spoke with Dana Wolford, she implied that petitioner refused to tell her where he was so that she would not have to reveal the information. (RA3 at 636).  The prosecutor stated that he had the same impression about his conversation with Dana Wolford's mother, Lynn. *Id.*  Petitioner did not want them to know where he was so that they would not be able to tell anyone. *Id.*  Lynn Wolford told the prosecutor that she did not know where petitioner was calling from, although she believed that it was a long distance telephone call. (RA3 at 633).  Finally, the prosecutor stated that Dana Wolford told

him that the petitioner was aware that the charges were pending, but was not "going to stay in this area to face these charges." (RA3 at 637).

Petitioner's grandmother told the prosecutor that she had spoken to petitioner in the "past couple of months," and he told her that he was "out of jail" in North Carolina.[4] (RA3 at 632-33). The U.S. Marshal was investigating the telephone numbers of both petitioner's grandmother and Dana Wolford, in an attempt to determine the location from which petitioner was calling them. (RA3 at 633).

The prosecutor's staff spoke to Captain Pendergrast in Henderson, North Carolina. (RA3 at 632). The prosecution also contacted Officer Diaz from the North Carolina prison system on September 11 or 12, 2001. (RA at 634). The prosecutor spoke with Officer Diaz to determine whether petitioner was incarcerated in North Carolina. (RA3 at 634). According to Officer Diaz, petitioner was not in the North Carolina prison system, and he had not been in that prison system recently. (RA3 at 634).

The trial judge stated that the most important point was that petitioner was not incarcerated in North Carolina and had not been incarcerated there recently. (RA3 at 634). The court also asked the prosecutor to explain the petitioner's connection to Dana Wolford and her family. (RA3 at 635-36). The prosecutor stated that Dana Wolford was petitioner's girlfriend at the time of the incident, and she had actually

---

[4] The women to whom the prosecutor spoke did not testify at the hearing. The prosecutor was relating his out-of-court conversations with these individuals.

13

moved to North Carolina with petitioner after the shooting. (RA3 at 635). The court found that the prosecutor had contacted both petitioner's family members and people that were "close" to petitioner in an attempt to "track him down." (RA3 at 635-36).

Defense counsel continued to argue that the search for petitioner had not been performed in a timely manner. (RA3 at 638). The judge stated that although he agreed that the hearing should have been conducted earlier, the information that was furnished made the judge "comfortable" finding that even if the inquiry had been made prior to trial, the result would have been the same.[5] (RA3 at 638). The judge found that the *Parker* requirements had been satisfied, and there was a sufficient basis to continue with the trial to completion. (RA3 at 638-39). In making this finding, however, the judge also told the prosecutor to continue to make efforts to locate petitioner, including checking the "national system" throughout the trial. (RA3 at 639).

The trial continued, and the testimony lasted two days. At trial, Shirley Lindsey, the woman who drove petitioner to the Sunoco gas station, testified that she saw petitioner shoot at the maroon car. (RA2 at 461). Dana Wolford testified that she saw petitioner walking towards the maroon car with a gun, heard gunshots

---

[5] The judge referred to a "look-back" period which allowed the judge to find that the results would have been the same even if the inquiry had been made before September 10th. (RA3 at 639). The judge may have been referring to a "look-back" period in the state or national criminal data bases which indicated that the petitioner was not currently incarcerated, nor had he been incarcerated in the recent past. Additionally, it appeared that petitioner had not been in the North Carolina prison system in at least the last year before the trial. (RA3 at 635).

coming from the direction of the maroon car, and then saw petitioner running away from the Sunoco station. (RA3 at 678-80).  The jury was charged on September 14, 2001, and returned its verdict the same day.

Petitioner was sentenced *in absentia* on October 10, 2001. (RA3 at 825-32). At the sentencing hearing, defense counsel reiterated his objection to the *in absentia* proceedings. (RA3 at 826).  The prosecutor stated that efforts were still being made to locate petitioner. (RA3 at 827).  The prosecutor mentioned that the U.S. Marshals were continuing to investigate the telephone numbers in order to determine the origin of petitioner's telephone calls. *Id.*  The court made a specific finding that it was appropriate to sentence petitioner in his absence. (RA3 at 828).

Petitioner was ultimately found.  Although there are no details, respondent states that "petitioner was returned to Court after his extradition from North Carolina". (Dkt. No. 8, Mem. of Law at 4).  After his return to New York, petitioner appeared in Schenectady County Court in August 2002 for re-sentencing.[6]  (RA3 at 835).

**B.    Jury Selection and Peremptory Challenges**

Petitioner also alleges that the trial court improperly denied two of petitioner's challenges to potential jurors for cause. (Petition, ¶ 12 (A)).  Petitioner claims that

---

[6]The reason for re-sentencing was that petitioner had been incorrectly sentenced to a determinate term of incarceration, and should have been sentenced to an indeterminate term of incarceration based upon the date of the offense. (RA3 at 836-37).

his attorney "was compelled to exhaust his peremptory challenges before the close of jury selection." *Id*. Petitioner does not name or otherwise identify the jurors in question in either his Petition or Traverse. *See* Petition (Dkt. No. 1) and Dkt. No. 11. In his direct appeal, petitioner alleged that the two potential jurors were Miss Anderson (Juror Number 151) and Miss Olley (Juror Number 186). (Appellant's Brief at 8-9). Both potential jurors were the subject of challenges for cause that were denied. (RA1 at 296, 298). Defense counsel then used peremptory challenges to excuse these two jurors. (RA1 at 298, 300).

The issue arose during voir dire, when defense counsel questioned all the potential jurors about their ability to follow the judge's instructions if the defense did not put in any proof. (RA1 at 268). Most of the jurors stated that they could keep an open mind, and that they would have no difficulty following the judge's instructions. (RA1 at 268-71). Defense counsel then asked Juror Number 46 if he could refrain from making adverse inferences if the defense did not put in any evidence. The exchange was as follows:

> Mr. Kessler: Mr. Rosner, what about you?
>
> Juror Number 46: What?
>
> Mr. Kessler: Let's say I don't put on any proof, and you know, you receive your instruction from the Judge and, you know, you're not supposed to hold that against my client. Are you going to realistically be able to do that? Are you going to be able to follow that?
>
> Juror Number 46: Follow the Judge's instructions, right.

Mr. Kessler: How about you, Mr. Ritter?

Juror Number 60: Well, what are you saying, no evidence at all?  He's going to be done, so you're going to be done right after?

Mr. Kessler: And I'm going to be challenging their proof.

Juror Number 60: You're not going to have any witnesses you're saying?

Mr. Sanderson: Let's say that would be the situation.

Juror Number 60: I would be suspicious as well.

Mr. Kessler: Would you be able to put that suspicion out of your mind if the Judge told you you had to?  I'm not asking you – everyone wants to follow the Judge's instruction.  Realistically are you going to be able to?

Juror Number 60: I don't think so.  I would really be wondering why?

Mr. Kessler: Anybody else feel the same way, that even notwithstanding the instruction to the contrary, you just don't think you would be able to avoid inferring something negative against my client if I don't introduce any evidence?

(RA1 at 268-70).  Defense counsel then asked the next four jurors, who all stated that they could still be objective. (RA1 at 270).  The next two jurors were Miss Anderson and Miss Olley, who stated as follows:

Mr. Kessler: Miss Anderson?

Juror Number 151: Not sure.

Mr. Kessler: Miss Olley, sure or not sure?

Juror Number 186: Not sure.

(RA2 at 270[7]).  At the conclusion of the questioning, the court allowed Mr. Rosner and Mr. Ritter to be excused for cause. (RA1 at 300, 303-304).  The judge "suggested" a challenge for cause for Mr. Rosner and found that Mr. Ritter's responses were insufficient to indicate a willingness to follow the law if the defense did not present any evidence. (RA1 at 300, 304).

Defense counsel also sought to excuse both Miss Olley and Miss Anderson for cause based upon the same reasons as Mr. Rosner and Mr. Ritter. (RA1 at 296, 298). Defense counsel argued that Miss Olly was one of the potential jurors who stated that she could not give any "assurance" that she would not hold it against the defense if counsel did not present any evidence. (RA1 at 296).  The judge stated, "I don't believe that question was ever put to her directly," and denied the challenge for cause. (RA1 at 296-97).  The judge explained,

> I don't find that the question was put to her in an unambiguous, direct
> way.  I think there was some muddying of several questions regarding if
> you had a doubt and you thought it was reasonable.  I'm not going to
> permit that to bootstrap to a conclusion that this . . .  juror is saying
> she's going to refuse to follow the Court's instruction.

(RA1 at 298).  Defense counsel utilized a peremptory challenge to excuse Miss Olley. (RA1 at 298).

---

[7]Page 270 in Volume I of the trial transcript was not included in the trial transcript.  The pages are numbered consecutively for the Record on Appeal submitted to the Appellate Division by petitioner's appellate counsel as part of his direct appeal.  The court was able to locate the missing page in the Appendix (Volume I) to Appellant's Brief in petitioner's State Court Records.

With respect to Miss Anderson, defense counsel had some additional concerns. In arguing that Miss Anderson should be excused for cause, counsel stated that

> if [Miss Anderson] thought [petitioner] was probably guilty but had a reasonable doubt, she wouldn't necessarily vote to acquit, and my memory might fail me, but I seem to remember possibly that she was one of the jurors who indicated having a problem with only hearing one side of the case and possibly holding it against the defendant if there was no defense case.

(RA1 at 298-99).  The judge did not agree with counsel's argument and rejected the challenge for cause. (RA1 at 300, 299).  Defense counsel used a peremptory challenge to excuse Miss Anderson. (RA1 at 300).  In the three rounds of jury selection, Mr. Ritter was the last juror that defense counsel challenged for cause.  (T1 at 303-04).  Mr. Ritter's challenge occurred in the second round of jury selection, and there were no additional defense challenges to potential jurors for cause for the rest of the second round and the entirety of the third round.

## 2.   **Scope of Review**

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), claims adjudicated on the merits in state court will stand

> unless the adjudication . . . (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. 2254(d)(2007).  The Second Circuit describes this as a deferential review,

and states that

> the necessary predicate to this deferential review is, of course, that petitioner's federal claim has been adjudicated on the merits by the state court.  If a state court has not adjudicated the claim on the merits, we apply the pre-AEDPA standards, and review *de novo* the state court disposition of the petitioner's federal constitutional claims.

*Cotto v. Herbert*, 331 F.3d 217, 230 (2d Cir. 2003)(quoting *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001)).

"[A] state court adjudicates a petitioner's federal constitutional claims on the merits when it (1) disposes of the claim on the merits, and (2) reduces its disposition to judgment."  *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir. 2002)(citations omitted).  In order to determine whether a state court has disposed of a claim on the merits, the following factors are considered: "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits."  *Aparicio*, 269 F.3d at 93 (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 314 (2d Cir. 2001)).

A state decision is "contrary to clearly established Federal law if it 'contradicts the governing law' or 'if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from the Supreme Court."  *Ramirez v. Miller*, 2005 U.S. Dist.

LEXIS 4306, *10 (S.D.N.Y. March 11, 2005)(quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  The "contrary to" standard requires not just an incorrect application of the law, but an *unreasonable* application. *Id*.  "Objective unreasonableness includes an unreasonable refusal 'to extend a clearly established, Supreme Court defined, legal principle to situations which that principle should have, in reason, governed." *Id*. (quoting *Kennaugh v. Miller*, 289 F.3d 36, 45 & n.2 (2d Cir. 2002)).

Pursuant to 28 U.S.C. § 2254(e)(1), "a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. 2254(e)(1) (2007). *See Sorto v. Herbert*, 364 F. Supp. 2d 240, 248-49 (E.D.N.Y. 2004).  The Supreme Court held that "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold." *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007).

## 3.    **Trial *In Absentia***

Petitioner alleges that it was constitutional error for the state court judge to conduct the trial in petitioner's absence.  (Petition, ¶ 12 (B)).  In his petition, petitioner states that

> [t]he record was devoid of any indication that County Court conducted
> any inquiry into whether petitioner absented himself from the

jurisdiction of the Court.  The only testimony was from the prosecution, who put forth certain statements on the record after the trial had already begun.  Furthermore, there were no questions put to petitioner once he was produced and incarcerated on this conviction to determine where he was, whether he was incarcerated in another jurisdiction, or if he was even aware of his trial dates.

*Id*.  The Appellate Division found no error by the trial court.  The Appellate Division found that petitioner was aware that he could be tried *in absentia*, and that the trial court "made reasonable efforts to secure his attendance, including postponing trial and issuing a warrant for his arrest."  *People v. Stroman*, 6 A.D.3d at 819, 775 N.Y.S.2d at 118.  The Appellate Division stated that the "trial in absentia proceeded only after it became apparent that a further adjournment pending execution of the bench warrant would not likely result in locating defendant within a reasonable period of time."  *Id*.   (internal citations omitted).  The New York Court of Appeals denied leave to appeal. *People v. Stroman*, 3 N.Y.3d 648, 782 N.Y.S.2d 419, 816 N.E.2d 209 (2004).  Based on the decision of the Appellate Division, it is clear that the State courts denied petitioner's constitutional claim "on the merits,"[8] and this court must apply the AEDPA standard of review.

The Sixth Amendment confrontation clause guarantees a criminal defendant

---

[8] The court notes that although the Appellate Division did not cite to the Sixth Amendment, the court did rely upon New York cases that cite *People v. Parker*, a case that specifically relies in part, on the Sixth Amendment and upon Supreme Court cases that discuss a "knowing and voluntary waiver" of a defendant's constitutional rights. *See People v. Stroman*, 6 A.D.2d at 819, 775 N.Y.S.2d at 118 (citing *inter alia People v. Diotte*, 305 A.D.2d 721, 759 N.Y.S.2d 244 (3d Dep't), *lv. denied*, 100 N.Y.2d 764 N.Y.S.2d 390, 796 N.E.2d 482 (2003)(relying on the *Parker* analysis). *See infra* n.9

the right to be present at all stages of his trial. *Illinois v. Allen*, 397 U.S. 337, 338 (1970).  The Second Circuit has noted that this right also flows from the guarantee of a fair trial articulated in the due process clauses of the Fifth and Fourteenth Amendments. *Clark v. Stinson*, 214 F.3d 315, 322 n.5 (2d Cir. 2000).  It is well-established Supreme Court precedent that a defendant may waive his right to be present at trial. *Taylor v. United State*s, 414 U.S. 17, 20 (1973); *Diaz v. United States*, 223 U.S. 442, 456-58 (1912).  The waiver must be both knowing and voluntary[9], though knowledge and voluntariness may be inferred.  *Taylor*, 414 U.S. at 19-20. *See also*, *Smith v. Mann*, 173 F.3d 73, 76 (2d Cir. 1999)("nothing in the Constitution prohibits a trial from being commenced in the defendant's absence so long as the defendant knowingly and voluntarily waives his right to be present").  A defendant's waiver of his right to be present at trial may be implied from the defendant's conduct, either during or before trial.  *Taylor*, 414 U.S. at 19-20 (implied waiver from jumping bail in the middle of trial); *Allen*, 397 U.S. at 346-47 (implied waiver from disruptive behavior during trial); *Bogle v. Zon*, 04 Civ. 7965, 2004 U.S. Dist. LEXIS 51821, *8 (S.D.N.Y. July 17, 2007)(failing to appear for trial)(citing *Allen*, 397 U.S. at 342-43).

---

[9]In *Parker*, the controlling New York case on this issue, the New York Court of Appeals relied on two Supreme Court cases when it stated that "[i]n order to effect a voluntary, knowing and intelligent waiver, the defendant must, at a minimum, be informed in some manner of the nature of the right to be present at trial and the consequences of failing to appear for trial." *Parker*, 57 N.Y.2d at 141 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 243-44 (1973); *Brady v. United States*, 397 U.S. 742, 748 (1970)).

In this case, petitioner was advised in January 2001 of his right to appear in court, and of his obligations to notify the court and the prosecutor if he were going to be absent from court. (RA1 at 21-22).  On January 22, 2001, petitioner was provided with a written *Parker* admonishment, which he reviewed with his counsel and then signed.  *Id*.  The *Parker* admonishment included a statement of the consequences for failing to appear for court dates: "the proceedings may go on without you, <u>even including a trial</u>." (RA3 at 971a)(emphasis in original).  Petitioner stated on the record that he had read the *Parker* admonishment, he understood it, and he agreed to be bound by it. (RA1 at 21-22).

Although petitioner was present at an April 5, 2001 court appearance (RA1 at 103) because he was apparently still incarcerated, he failed to appear at any of the subsequent pre-trial hearings on June 8 (RA1 at 106), July 6 (RA1 at 109), and August 31, 2001 (RA1 at 117).  The *Parker* admonishment ***clearly*** advised petitioner of the consequences of not appearing in court, and petitioner clearly stated that he understood.  Petitioner has not argued that his right to confrontation was impeded by external forces that prevented him from attending his court dates, nor has he made any argument that undermines the trial court's finding that petitioner had voluntarily absented himself from the court's proceedings.[10]

---

[10] The court must point out that the reason that plaintiff initially appeared in ***2001*** for a ***1998*** shooting was because petitioner fled the jurisdiction after the incident and was arrested in North Carolina.

Petitioner's trial counsel repeatedly objected to the conduct of the trial in petitioner's absence, but not in the context of *why* petitioner was absent. Trial counsel's objections related to the prosecution's efforts to locate petitioner. Trial counsel did not explain petitioner's absence, and stated that he had no contact with petitioner after the April, 2001 court appearance. The Second Circuit has found waiver "when the defendant had no contact with anyone and was presumed to have fled." *United States v. Mackey*, 915 F.2d 69, 73 (2d Cir. 1990) (citing *United States v. Sanchez*, 790 F.2d 245, 249-50 (2d Cir.), *cert. denied*, 479 U.S. 989 (1986)).

In *Bogle v. Zon*, 04 Civ. 7965, 2007 U.S. Dist. LEXIS 51821 (S.D.N.Y. July 17, 2007), the petitioner objected to his trial being conducted *in absentia*. The petitioner in *Bogle* argued that because he was never told the exact date of his trial and because he was never warned of the specific consequences of his failure to appear, he could not have knowingly and intelligently waived his Sixth Amendment right to appear. *Id.* at * 4-5. Bogle was released on bail, but never received the "*Parker*" warning. *Id.* The state trial court held a hearing in Bogle's case, and the court concluded that Bogle had previously appeared for trial dates, that he had extensive experience with the criminal justice system and therefore knew that he was required to appear for trial. *Id.* at *6-7.

The habeas court found no constitutional violation, notwithstanding the state trial court's failure to provide Bogle a *Parker* warning, and Bogle's failure to have

received notification of a specific trial date. *Id.* at *10.  The habeas court stated that

only "minimal knowledge on the part of the accused is required when waiver is

implied from conduct." *Id.* (quoting *United States v. Nichols*, 56 F.3d 403, 416 (2d

Cir. 1995)(other citations omitted)).  The court further stated that "[t]he law does not

allow a person to take advantage of their illegal behavior when he 'absconds from

the jurisdiction while at large on bail.'" *Id.* (quoting *Gilchrist v. O'Keefe*, 260 F.3d

87, 96 n.5 (2d Cir. 2001)(citing *Diaz v. United States*, 223 U.S. at 458 (additional

citations omitted)).

In *Alston v. Portuondo*, 01-CV-7391 (JBW), 2003 U.S. Dist. LEXIS 22599

(E.D.N.Y. Oct. 7, 2003), the court denied habeas relief after petitioner failed to

appear at all pretrial proceedings and the trial itself.  In *Alston*, the state trial judge

warned petitioner about the consequences of failing to appear, and when petitioner

did not appear, the trial court held a hearing to ascertain what efforts had been made

to locate the petitioner. *Id.* at *19.  The state trial court also considered the delay that

would occur from a further adjournment of the trial and its impact on Alston's co-

defendant if the trials had to be severed. *Id.*

The habeas court in *Alston* also found that it was "of no moment that the trial

court's *Parker* hearing was conducted after the suppression hearing." *Id.* at *20.

Alston claimed that his waiver was not voluntary because he was incarcerated in a

Pennsylvania jail at the time of the trial. *Id.* at *19.  The habeas court found that this

26

argument was "thoroughly unconvincing" because petitioner knew that his trial was going to proceed, yet he left the state and committed new crimes for which he was arrested in Pennsylvania. *Id.* at *19-20.

In rejecting this argument the habeas court in *Alston* distinguished two Second Circuit cases in which the defendants did not appear because they were placed under arrest on unrelated charges, but there was no evidence that the defendants had intended to absent themselves from their trials. *Id* (distinguishing *United States v. Crutcher*, 405 F.2d 239 (2d Cir. 1968); *United States v. Fontanez*, 878 F.2d 33 (2d Cir. 1989)).  Petitioner's behavior in this case is also distinguishable from *Crutcher* and *Fontanez*.  Petitioner was apparently released from confinement and left the area. There is no indication that he was arrested or in custody at the time of trial, and this fact was confirmed by the trial court, during the hearing.  Petitioner's whereabouts were discussed ***several*** times before trial actually began.

In this case, petitioner does not allege any reason for his absence.  While this court does not have all of the details, it is clear that petitioner absconded, and was eventually extradited to New York from North Carolina.  Petitioner also does not allege that his absence was anything other than voluntary and knowing.  Rather, petitioner's argument is that the trial court did not inquire deeply enough into petitioner's whereabouts.  While the court's detailed inquiry into the prosecutor's efforts to locate petitioner was not held until the third day of the trial, the results of

the inquiry reassured the trial court that petitioner could not have been found prior to trial. (RA3 at 638-39).

There was, apparently, some delay by the District Attorney's office in entering the bench warrant into the national database, and in looking for petitioner in North Carolina.  However, it was clear that the prosecutor had spoken to the petitioner's family, girlfriend, and law enforcement officials regarding petitioner's whereabouts. (RA3 at 631-36).  When all of the relevant database searches and phone calls had been made, the trial judge found that "there's a look-back period which enables me to say had we done this before [the first day of trial], the result would be the same as it is today."  (RA3 at 638-39).  The trial judge also told the prosecutor to continue to make efforts to locate petitioner, including checking the "national system" *throughout the trial*. (RA3 at 639).

In this case, petitioner was arraigned over *two years* after the shooting because he absconded shortly after the shooting.  Petitioner failed to have any contact with his counsel, the prosecutor, or the court after the court appearance on April 5, 2001. The court delayed the start of petitioner's trial for several months.  Petitioner had no contact with the court until his re-sentencing in August 2002.  Petitioner has not offered any explanation whatsoever to rebut the trial court's finding that petitioner had absconded.  By signing the *Parker* admonishment in January and failing to appear at court proceedings as of July 6, 2001, petitioner waived his right to be

present.  The trial court balanced petitioner's right to be present, his waiver, the

case's past delays, and the efforts made by the prosecution to locate petitioner. (RA2

at 386-87).  The court then determined that the case should proceed. (RA2 at 387).

Petitioner seems to argue that he could not waive his right to be present

because did not know the date of his trial. (Petition, ¶ 12 (B)).  While petitioner may

not have been aware of his specific trial date when it was tentatively set in late

August 2001, he was aware of his pending charges.  Furthermore, petitioner absented

himself from the court proceedings in Schenectady County Court months before the

trial date was set.  When he signed the *Parker* admonishment, petitioner was notified

of his obligations to the court, and of the consequences for failing to meet those

obligations.  The court in *Bogle* specifically found that "[n]othing in the Constitution

supports Bogle's contention that he cannot waive his *Sixth Amendment* rights where

the trial date is "soft . . . ." 2007 U.S. Dist. LEXIS 51821 at *10.

This court finds that the state court did not act contrary to, or unreasonably

apply clearly established Federal law, as determined by the Supreme Court of the

United States, nor did the court make a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the State court

proceeding.  It was apparent that petitioner voluntarily left the state after the shooting

and after he was finally brought back to New York and released on bail.  Whatever

"technical" errors petitioner claims were committed by the court in making its

29

determination, it is clear that the court acted consistently with Supreme Court precedent in finding that petitioner waived his Sixth Amendment right to be present at his trial.[11]  Petitioner's claim may be dismissed.

**4.      Jury Selection**

In affirming petitioner's conviction, the Third Department stated that "we disagree with [petitioner's] contention that County Court committed reversible error by denying his counsel's challenge for cause to two jurors [Miss Olley and Miss Anderson] . . ." *People v. Stroman*, 6 A.D.3d at 818-19, 775 N.Y.S.2d at 118.  The court explained that by

> [c]hoosing to interpret [Miss Olley's and Miss Anderson's] responses as revealing possible bias rather than a request that he clarify his convoluted question, [petitioner's] counsel did not avail himself of the opportunity to pursue the issue any further.  In this context, and considering that [petitioner's] counsel questioning excluded the fact that, at trial, the jury would also hear cross-examination of the People's witnesses, the jurors' response could not be said to reveal an inability to render an impartial verdict.

*Id*. 6 A.D.2d at 819, 775 N.Y.S.2d at 118.  The Appellate Division decided this issue on the merits, and thus, this court will apply the AEDPA standard.

The Constitution guarantees a defendant "the right to a speedy and public trial,

---

[11] Petitioner also seems to argue that the trial court failed to ask petitioner where he had been after the petitioner was finally returned to the court for sentencing.  Petitioner's vague statement is irrelevant to the court's decision to proceed in petitioner's absence, and this court notes that at the time that the judge made the decision to proceed, he had satisfied himself that petitioner was not incarcerated, and had not recently been incarcerated in any state or federal facility. (RA3 at 637).

by an impartial jury . . ." U.S. CONST. amends. VI and XIV.  "[T]he Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually presented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case."  *Lockhart v. McCree*, 476 U.S. 162, 184 (1986).

In *Ross v. Oklahoma*, a capital defendant used a peremptory challenge to remove a juror after his challenge for cause was denied.  *Ross v. Oklahoma*, 487 U.S. 81, 86 (1988).  The Supreme Court noted that in *Ross*, none of the twelve jurors who sat for the trial was challenged for cause by Ross, and that Ross had not alleged that any of the jurors was not impartial.  *Ross*, 487 U.S. at 86.  The Court found that the trial court committed error by denying the challenge for cause, but rejected "the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to an impartial jury." *Ross*, 487 U.S. at 88 (citing *Gray v. Mississippi*, 481 U.S. 648, 663 (1987); *Swain v. Alabama*, 380 U.S. 202, 219 (1965); *Stilson v. United States*, 250 U.S. 583, 586 (1919)).  The court also stated that it had long recognized that peremptory challenges were not of constitutional dimension. *Id.* The Supreme Court also held that "[s]o long as the jury that sits is impartial the fact that the defendant had to use a peremptory challenge to achieve that result does not mean the Sixth Amendment was violated."  *Ross*, 487 U.S. at 88.

31

As in *Ross*, the petitioner in this case does not allege that any of the jurors for his trial was not impartial.  Petitioner's allegation seems to be that because he had to use his peremptory challenges on jurors who were unsuccessfully challenged for cause, he did not have enough peremptory challenges left for the remaining jury selection.  However, none of the jurors who heard petitioner's case had been challenged for cause, but participated in the trial because the court denied the challenge for cause, and petitioner had run out of peremptory challenges.

Respondent argues that petitioner's claim is not cognizable because petitioner "does not now and did not claim before the New York State Courts that the that the [sic] jury that was actually impaneled and convicted him was biased . . ."  (Dkt. No. 8, Mem. of Law at 8).  In his Traverse, petitioner responded to the argument by stating that in state court he argued that he suffered "a fundamental denial of his constitutional right to trial by an 'impartial' jury." (Dkt. No. 11 at 4).  Petitioner also cites *U.S. v. Taylor* for the proposition that "where a petitioner correctly asserts that his/her right to exercise peremptory challenges has been denied or impaired, they need not show that the jury was biased in order to obtain a new trial." *Id*. (citing *U.S. v. Taylor*, 92 F.3d 1313, 1325 (2d Cir. 1996), *cert denied*, 519 U.S. 1093 (1997)).

Petitioner incorrectly cites *U.S. v. Taylor*.  The court must first point out that *Taylor* specifically stated that the right to exercise peremptory challenges "is not a constitutional right." 92 F.3d at 1325 n.7 (citing *Ross v. Oklahoma*, 487 U.S. at 88).

In any event, the court stated that in order to succeed on his claim, the defendant would have to show that there was a "denial or impairment of the right to exercise peremptory challenges." *Id.* at 88.  In this case, there has been no denial or impairment of petitioner's right to exercise peremptory challenges.  Petitioner is unable to point to a juror who was challenged for cause, but who sat on the jury that convicted him.  He simply has not alleged that a partial or biased juror (or jury) was seated.   This court finds that the Appellate Division's affirmance of the trial court's decisions about Miss Olley and Miss Anderson was not contrary to, or an unreasonable application of Supreme Court law.

Because this court has found no substantial showing of the denial of a constitutional right, it is also recommended that no certificate of appealability be granted pursuant to 28 U.S.C. § 2253(c)(1)(A).

**WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the petition be **DENIED and DISMISSED**, and it is further

**RECOMMENDED**, that no certificate of appealability be issued.

Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**.

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: November 19, 2008

Hon. Gustave J. DiBianco
U.S. Magistrate Judge